**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| NML CAPITAL, LTD. | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. 08-cv-574 |
| | § | |
| v. | § | |
| | § | |
| EXCELERATE ENERGY, LLC | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

**<u>NML Capital's Motion to Compel</u>**

NML Capital, Ltd. ("NML") brings this motion pursuant to Federal Rule of Civil Procedure 30, 45, and 69 to compel Excelerate Energy, LLC ("Excelerate") to comply with two subpoenas served on July 1, 2008 and August 29, 2008.

**I.     Introduction**

The Republic of Argentina ("Argentina") owes NML over a billion dollars – $300 million of which has been reduced to judgment – all of which Argentina steadfastly refuses to pay.  Frustrated with Argentina's obstinacy, the Manhattan federal court presiding over NML's actions against Argentina has both encouraged NML to seek creative means to collect, and endorsed NML's efforts to take discovery regarding Argentina's assets, wherever in the world they may be located, in furtherance of these collection efforts.  This motion involves one effort by NML to take discovery about Argentina's assets.

13301844

Excelerate is a corporation headquartered in The Woodlands, Texas, whose principal business is the delivery and regasification of liquefied natural gas ("LNG").  In response to news reports that Excelerate has been supplying LNG to Argentina, NML served subpoenas on Excelerate seeking basic information about the mechanics of these shipments – most critically, when, where, and how Argentina acquires a property interest in the cargoes.  This information is highly relevant to NML's enforcement efforts because any property of Argentina, including LNG, is potentially subject to seizure by NML in satisfaction of its judgment and anticipated judgments against Argentina.  For over four months, Excelerate has resisted compliance with the subpoenas – first seeking extensions of its time to respond, then refusing to respond based on a strained reading of the requests, then promising to produce information only to renege on that promise.  Finally, after being threatened with court involvement, Excelerate produced three heavily redacted pages from a 62-page agreement setting forth the terms of its delivery of LNG to Argentina.  Even this meager production all but confirmed that Excelerate possesses substantially more information responsive to the subpoenas.

By this motion, NML seeks to bring an end to Excelerate's evasive tactics and move forward with the discovery to which it is legally entitled.  For the reasons set forth below, NML respectfully requests that this Court order Excelerate immediately to produce documents and to make a witness available for deposition as required under the subpoenas.

## II.     Background

### A.     The Underlying Litigation

NML has brought nine lawsuits against Argentina in the United States District Court for the Southern District of New York (the "New York Court") for failing to pay over $1.2 billion in

interest and principal on defaulted Argentine sovereign debt.   Declaration of Dennis H. Hranitzky, dated November 19, 2008 ("Hranitzky Decl.") ¶ 3.[1]   The terms and conditions of this debt are set forth in a Fiscal Agency Agreement ("FAA"), dated October 19, 1994, between Argentina and Bankers Trust Company, in which, among other things, Argentina waived all claims of sovereign immunity and consented to suit in New York.   FAA (*id*. Ex. B) at 29. Because there is no dispute that Argentina defaulted on the debt at issue in these actions, NML has been awarded final judgment in *NML I* and summary judgment in *NML II-VI*, and expects soon to be awarded summary judgment in *NML VII-IX*.   *Id.* ¶¶ 4 - 12.   The judgment in *NML I* awarded NML $284 million against Argentina, and became final and non-appealable on February 13, 2007. *Id.* ¶ 4.   When final judgment has been awarded in all of the pending NML actions, NML expects the sum of those judgments to exceed $1.2 billion.   *Id.* ¶ 4.

After defaulting on its debts to foreign investors, Argentina began a course of action to frustrate the inevitably forthcoming collections.   Throughout 2001, in anticipation of its own default that December, Argentina ordered its central bank to transfer billions of dollars of its assets on deposit in New York to the Bank of International Settlements in Basel, Switzerland – avowedly to avoid seizure by Argentina's creditors. (Hranitzky Decl. Ex. E).   And since its default, Argentina has gone to extraordinary lengths to evade its creditors – a fact it has boasted about publicly.   *See The Government is Protecting Itself from Attachment*, La Nación, Feb. 5, 2004 (Hranitzky Decl. Ex. A) ("[r]eserves of the Central Bank of Argentine Republic on deposit

---

[1]     NML's nine actions against Argentina are *NML Capital, Ltd. v. The Republic of Argentina*, 03-8845 ("*NML I*"), 05-2434 ("*NML II*"), 06-6466 ("*NML III*"), 07-1910 ("*NML IV*"), 07-2690 ("*NML V*"), 07-6563 ("*NML VI*"), 08-2541 ("*NML VII*"), 08-3302 ("*NML VIII*"), 08-6978 ("*NML IX*").

- 3 -

in New York banks have been withdrawn, funds on deposit in the New York branch of Banco Nación have been repatriated, and salaries of Argentine officials posted to other countries are being deposited in Argentina or paid in the form of cash sent via diplomatic pouch, which has immunity."). Utterly exasperated with Argentina's willful refusal to satisfy its creditors' claims, the New York Court has repeatedly condemned Argentina's intransigence. To quote just two examples:

> I have heard nothing from the Republic about any offer, not the slightest offer, to honor the obligations they have to the bondholders who are suing. There are judgments. Some have obtained judgments, others will obtain judgments very shortly. Those are legal judgments. They are legal, binding judgments against the Republic. March 25, 2005 Tr. (Hranitzky Decl. Ex. F), at 6.

> The trouble is the Republic is neither paying these debts, which they owe, nor is the Republic paying the judgments, which they owe. And regardless of the exchange offer, they owe money on judgments of the Republic owes money on the judgments, they owe it. And not a whimper has been voiced of an attempt to pay their lawful debts, the Republic's lawful debts. February 2, 2007 Tr. (Hranitzky Decl. Ex. G), at 24-25.

Beyond merely condemning Argentina's behavior, the New York Court has encouraged plaintiffs like NML to seek creative means of collecting against Argentina, and has declared a judicial policy of exercising its discretion to give plaintiffs the benefit of the doubt in connection with such efforts. As the New York Court explained last year at a hearing on NML's attachment of over $100 million in assets held in the name of Argentina's central bank based on NML's claim that the central bank is Argentina's alter ego:

> And as far as I'm concerned, I feel, as a matter of whatever I could say, the policy of this Court, it would be my view that the plaintiffs in these actions should be allowed some liberality in exploring means of enforcing their judgments. And I do not intend to take a narrow view when it comes to dealing with attempts to enforce the judgments.

- 4 -

13301844

February 2, 2007 Tr. (Hranitzky Decl. Ex. G), at 25.  In the same vein – and for the same reasons – the court in New York has ruled that Plaintiffs should be allowed to take reasonable discovery about Argentina's assets, wherever they may be located around the world:

> [W]here you've got…judgments issued in this Court, and the possibility of enforcing those judgments in a foreign country, I would think that there should be discovery here…So, it would be my ruling that they are entitled, in principle, to reasonable discovery about assets in foreign countries. January 15, 2004 Tr. (Hranitzky Decl. Ex. I), at 33-34.

> I am not completely confident that any witness coming up from Argentina is going to testify truthfully without being confronted with some documents.  ***I am not impressed with the morality of the Republic of Argentina in its absolute steadfast refusal to honor its lawful debts.***  To me that is a dishonest position and so I am not confident that we will get honest testimony out of anybody from Argentina without having documents to confront them with.  May 30, 2008 Tr. (Hranitzky Decl. Ex. H), at 26.

**B.     Excelerate's Deal to Deliver Natural Gas to Argentina**

Earlier this year, Argentina faced an acute energy shortage necessitating swift access to additional sources of natural gas to meet national heating and transportation needs. *See* (Hranitzky Decl. Ex. D).   Through its energy ministry, ENARSA, Argentina enlisted international energy giant YPF, S.A. ("YPF") to help supply the needed natural gas, and YPF, in turn, identified Excelerate as a potential partner in the effort. *Id*.  Excelerate offers delivery of natural gas around the world by liquefying the natural gas at its headquarters in Houston, Texas, and shipping the LNG by boat to a port where it can be "regasified" for delivery to a land-based pipeline. *Id*.

The deal among Argentina, YPF, and Excelerate received extensive press coverage earlier this year.  According to press reports, Excelerate ships LNG by boat from Houston, Texas, to Bahia Blanca, Argentina where a second Excelerate ship with regasification

13301844

capabilities is docked. *Id.*   Upon arrival, the two ships link, and the LNG is regasified and pumped into Argentina's national pipeline.  *Id.*

The specific details of where, when, and how legal title to the natural gas passes to Argentina such that it would be subject to seizure, however, are not publicly available. Accordingly, NML was forced to seek information about the deal from the participants.  As YPF is an Argentine company, and therefore all but inaccessible for discovery purposes, Excelerate was the most logical target of this discovery.

### C.   NML's Efforts to Obtain Discovery From Excelerate

#### *1.   The First Subpoena*

On July 1, 2008, NML served Excelerate with a subpoena containing the following three narrowly-tailored document requests:

> 1.   All Documents relating to the satisfaction of Argentina's energy importation needs during the Relevant Time Period, whether directly through ENARSA or another Argentine State Controlled Entity, or indirectly through Repsol YPF or any other commercial entity not owned or controlled by Argentina.

> 2.   All Documents relating to LNG to be delivered to Bahia Blanca that you received, either directly or indirectly, from Argentina or ENARSA within the Relevant Time Period.

> 3.   All Documents relating to LNG to be delivered to Bahia Blanca copies of which were provided by you or any other Person to Argentina or ENARSA within the Relevant Time Period.

Declaration of Michael McDermott, dated November 19, 2008 ("McDermott Decl.") (McDermott Decl. Ex. 1).  The First Subpoena did not include request for deposition.  *Id.*

On July 10, 2008, counsel for Excelerate, Mike Medina, contacted counsel for NML to seek an extension of the July 14, 2008 deadline for production provided in the subpoena, and to

- 6 -

make objections.  (McDermott Decl., Ex. 3).  The parties agreed to extend the deadline to July

28, 2008, and to facilitate Excelerate's search, counsel for NML explained that the purpose of the

subpoenas was to gather post-judgment discovery regarding Argentina's valuable natural gas

assets, and specifically, to determine when title to those assets passed to Argentina.  (McDermott

Decl. Ex. 3; ¶ 2).  On July 28, 2008, Mr. Medina informed counsel for NML that Excelerate had

no documents responsive to Request Nos. 1 and 3, but would like an additional week to search

for documents responsive to Request No. 2.  NML granted the extension.  (McDermott Decl. Ex.

4).  One week later, Mr. Medina wrote to NML's counsel to report that Excelerate had no

documents responsive to any of the three document requests.  (McDermott Decl. Ex. 5) ("We

have confirmed that Excelerate has no documents *fitting within the three categories set forth in*

*the Subpoena*" (emphasis added)).  After receiving Mr. Medina's email, counsel for NML

contacted Mr. Medina to understand Excelerate's position, but Mr. Medina claimed to be unable

to provide any explanation.  (McDermott Decl. ¶ 3).

Perplexed by this stance, NML returned to the publicly available information in an

attempt to determine the source of the confusion, and hopefully, find a solution to the impasse.

Excelerate's claim to have no responsive documents was, however, odd considering the contrary

indications in its *own press release* titled "Excelerate Energy Announces Agreement to Develop

Argentina's First Ever LNG Import Facility."  In this May 19, 2008 release, Excelerate explained

that it had signed "definitive agreements with Argentina's YPF S.A. to develop a liquefied

natural gas importation facility at the port city of Bahia Blanca."  (Hranitzky Decl. Ex. C).

Citing to this press release, another description of the deal on Excelerate's website, and

several press articles describing the deal, NML explained the basis for its belief that Excelerate

- 7 -

was likely to possess responsive documents, and sought clarification of Excelerate's position. (McDermott Decl. Ex. 6).  Believing Excelerate simply misunderstood the scope or meaning of the requests, NML offered to work with Excelerate to resolve any confusion or other issues interfering with Excelerate's response. In response to NML's considerable effort, Excelerate merely reaffirmed in a conclusory one-line email that it had no responsive documents, and seemingly confirmed that its refusal rested on a strained reading of the document requests, upon which it refused to elaborate.  (McDermott Decl., Ex. 7) ("After once again conferring with my client, the answer is: Excelerate has no documents *which fit within the parameters, as defined, of any of the three categories*." (emphasis added)).

At no time during these exchanges between counsel did Excelerate raise any objections to the First Subpoena – thereby waiving any objections, whether or not well-founded, it ***may*** have had to the document requests contained in that subpoena.  Nonetheless, NML chose not to seek immediate recourse to this Court, electing instead to serve another subpoena on Excelerate, recasting its document requests in such a way as to preclude further gamesmanship based on a narrow interpretation of the language of the requests.

>    2.    *The Second Subpoena*

Without withdrawing the First Subpoena, NML served a second subpoena on Excelerate on August 29, 2008 (the "Second Subpoena") (McDermott Decl. Ex. 2).  Like the First Subpoena, the Second Subpoena requested documents related to the delivery of LNG to Bahia Blanca.  *Id.*  Substantively, the document requests in the Second Subpoena were similar to those set forth in the First Subpoena.  The requests differed only insofar as they were cast somewhat more broadly to prevent Excelerate from attempting to avoid responding to them based on a

strained, narrow reading.[2]   The Second Subpoena also called for a deposition encompassing delivery of LNG to Bahia Blanca, negotiations related to the agreement to deliver LNG to Bahia Blanca, and Excelerate's efforts in responding to the First Subpoena.

Excelerate responded to the Second Subpoena by denying that it had any "contractual relationship with the State of Argentina," but conceding that it had an agreement with YPF. (McDermott Decl. Ex. 8).[3]   Again, Excelerate offered no formal objections in response to NML's subpoena, but Mr. Medina did offer to produce a "highly redacted" version of that agreement in order to establish that it had no contractual relationship with Argentina.   NML accepted this offer, while fully reserving its rights to seek further production and a deposition should the production prove insufficient.   (McDermott Decl. Ex. 9).   After two weeks had elapsed and Excelerate had yet to deliver on its promise to produce its agreement with YPF, NML was finally

---

[2] The document requests in the Second Subpoena seek:

>   1. All Documents relating to the delivery of LNG to Bahia Blanca during the Relevant Time Period.

>   2. All Documents relating to any agreement between Excelerate and Argentina, ENARSA, Repsol YFP, the Planning Ministry, or any Argentine State Controlled Entity for the delivery of LNG during the Relevant Time Period.

>   3. All Documents relating to how and when Argentina, ENARSA, Repsol YFP, the Planning Ministry, or any Argentine State Controlled Entity would receive legal title to LNG delivered to Bahia Blanca during the Relevant Time Period.

>   4. All Documents related to the Bahia Blanca Agreement, including all drafts preceding the Bahia Blanca Agreement as well as any subsequent versions, executed or not, developed after the Bahia Blanca Agreement was executed.

>   5. The Bahia Blanca Agreement.

[3]    Excelerate offered only two quasi objections in its letter: (1) that NML should seek this information from Argentina, and (2) the structure of the arrangement to deliver LNG to Argentina was itself a trade secret. Neither statement was supported.

forced to give Excelerate a firm production deadline of October 10, 2008 – over a month after Excelerate had promised to produce the redacted agreement – after which it would seek relief from the court.  (McDermott Decl., Ex. 10).  Once again, Excelerate failed to comply.

On October 16, 2008, Excelerate belatedly produced three heavily-redacted pages of its 62-page "Charter Party and LNG Storage and Re-Gasification Services Agreement" (the "Charter Party"). (McDermott Decl., Ex. 11).  Even by the scant information provided in these three pages, the Charter Party all but confirmed that Excelerate has much more discoverable information about how LNG is transferred to Argentina.

The redacted Charter Party reveals a complex multi-party scheme for the delivery of LNG from Texas to Argentina.  The first part of the transaction is governed by the Charter Party, and appears to involve the delivery of LNG. In that part, YPF or another third party (*i.e.* not Argentina) is to have title to the LNG, and hold it throughout the delivery process.  The next part of the transaction, where the LNG is regasified and delivered into the Argentine pipeline at Bahia Blanca, is apparently not governed by the Charter Party.  Instead, the Charter Party expressly contemplates that YPF and Argentina would enter into a separate agreement "for the purposes of providing regasification services as set forth in this Charter" (the "Regasification Agreement"). (McDermott Decl. Ex. 11 at 1, 12).  The effect – and the apparent purpose – of this arrangement is to insulate the LNG from seizure by Argentina's creditors while in transit by vesting title in YPF or another third party.  Then, once in port at Bahia Blanca, title to the natural gas presumably transfers to Argentina directly, or through a government-controlled entity like ENARSA, according to the terms of the Regasification Agreement.

Given the close relation between the Charter Party and the Regasification Agreement, Argentina, YPF, and Excelerate almost certainly cooperated to ensure that the legal mechanics of the two – and potentially more – agreements achieved the parties' practical goals.  This cooperation means that Excelerate was likely privy to extensive information regarding how and when title to the natural gas or LNG passed to Argentina.  This information is probably reflected in emails between the parties, draft versions of the agreements, and internal assessments of the deal.  Additionally, Excelerate employees involved in the negotiations could clarify the meaning of these documents or fill in portions of the negotiations not reflected in documents.  In short, while the redacted Charter Party reveals only the deal's very basic structure, it strongly suggests that Excelerate and its employees can fill in the details, including how and when title to the LNG passes to Argentina.  This is the very information counsel for NML explained it was after when first speaking to Mr. Medina on July 10, 2008.

NML returned to Excelerate to communicate its concerns with Excelerate's woefully deficient production, and to give Excelerate a deadline of October 27, 2008 – nearly four months after the First Subpoena was served – to comply fully with the subpoenas. (McDermott Decl., Ex. 12).  Excelerate has offered no further production, nor has counsel for Excelerate contacted counsel for NML.  Excelerate has thus left NML no choice but to bring this motion.

III.    **Argument**

A.      **NML Is Entitled To Discovery From Excelerate**

Rules 30, 45, and 69 empower parties to litigation to seek post-judgment discovery from nonparties. Fed. R. Civ. P. 30, 45, and 69.  Nonparties are subject to post-judgment discovery to the same substantive extent available are under Fed. R. Civ. P. 26(b)(1), which allows discovery

on "any matter, not privileged, that is relevant to the claim or defense of any party." *Cmedia, LLC v. LifeKey*, 216 F.R.D. 387, 389 (N.D. Tex. 2003); *British Intern. Ins. Co., Ltd. v. Seguros La Republica, S.A.*, 200 F.R.D. 586, 589 (W.D. Tex. 2000) ("the purpose of post-judgment discovery is to learn information relevant to the existence or transfer of the judgment debtor's assets" (quoting *Federal Deposit Insurance Corp. v. LeGrand*, 43 F.3d 163, 172 (5th Cir. 1995)).

The New York Court has ruled that NML is entitled to seek discovery regarding the location of Argentina's assets wherever they may be in the world in order to satisfy its judgments.  (Hranitzky, Decl. Ex. I and H).  Such discovery is clearly justified in this case based on Argentina's utter refusal to satisfy NML's judgment, and its efforts described above to avoid paying any of the judgments against it that foreign investors like NML have secured since 2003. *See supra* at 2-5.  If NML is to recover anything from Argentina, then attachment and seizure of its assets is likely to be the only avenue.  As explained above, Excelerate stands as gatekeeper to information essential to one of the only promising attachment options.

### B.   Excelerate Has Failed to Act Reasonably in Responding to NML's Subpoenas

Fed. R. Civ. P. 45 defines the obligations of both the subpoenaing party and the party being subpoenaed.  Fed. R. Civ. P. 45; 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2464 (2008); *see generally Mosley v. City of Chicago*, 2008 WL 3411664 (N.D. Ill. Aug. 11, 2008) (discussing reasonableness standard applicable to nonparty subpoena practice).  Parties subject to subpoena, like parties in litigation, are obliged to turn over documents within their "possession, custody, or control."  Fed. R. Civ. P. 34(b); *see also Wiwa v. Royal Dutch Petroleum Company*, 392 F.3d 812, 822 (5th Cir. 2004) (confirming that Rule 34 allows discovery of documents within subpoenaed party's "possession, custody, or control").

13301844

Likewise, the party serving the subpoena is obliged to "take reasonable steps to avoid imposing undue burden or expense on" the subpoenaed party.  While NML has taken numerous steps to avoid court intervention, Excelerate has completely failed to meet its obligations, thereby necessitating this additional burden on all concerned.

In an attempt to ease the burden on Excelerate, both the First and Second Subpoenas were narrowly tailored to ease Excelerate's search, and only sought documents related to the "Relevant Time Period," which spans the manageable period of July 12, 2007 to December 31, 2008.  NML granted every requested time extension, and accepted (subject to a full reservation of rights) the only production Excelerate offered – the Charter Party – six days late and approximately a month and a half after Excelerate first offered to produce it.  NML even provided Excelerate with press reports to assist it in understanding the discovery requests.  In short, NML has done everything a subpoenaing party could do to ease the burden on Excelerate.

By contrast, Excelerate has done next to nothing to honor its obligations under Rule 45. This is most clearly evidenced by its production of the Charter Party after first claiming not to have any documents responsive to the first document request from NML's First Subpoena seeking

> All Documents relating to the satisfaction of Argentina's energy importation needs during the Relevant Time Period, whether directly through ENARSA or another Argentine State Controlled Entity, or indirectly through ***Repsol YPF or any other commercial entity not owned or controlled by Argentina***.

(emphasis added) (McDermott Decl. Ex. 1). Indeed, Excelerate claimed, on three separate occasions, that it had no documents responsive to this request.

> -    First, on July 28, 2008, Mr. Medina claimed that Excelerate had no documents responsive to requests 1 and 3 from the First Subpoena.  (McDermott Decl. Ex. 4).

13301844

-        Next, on July 31, 2008, Mr. Medina reported that, "[w]e have confirmed that Excelerate has no documents fitting within the three categories set forth in the Subpoena."  (McDermott Decl. Ex. 5).

-        Finally, on August 14, 2008, after NML reached out to resolve the impasse, Mr. Medina claimed "[a]fter once again conferring with my client, the answer is: Excelerate has no documents which fit within the parameters, as defined, of any of the three categories."  (McDermott Decl. Ex. 7).

Despite the Charter Party's clear responsiveness, Excelerate repeatedly refused to produce it, and worse, refused to engage in discussions with NML to avoid court involvement.

### C.        Excelerate Has Waived Its Objections To NML's Subpoenas

Excelerate failed to serve formal objections to either the First or Second Subpoenas, thereby waiving any substantive objection to the subpoenas.

Under Rule 45, a party responding to a subpoena must offer written objections with 14 days, or waive its objections.  Fed. R. Civ. P. 45(c)(2)(B) and (d)(2)(A); *Richter v. Mutual of Omaha Ins. Co.*, 2006 WL 1277906 at *2-3 (E.D. Wis. May 5, 2006); *Angell v. Shawmut Bank Conn. Na. Ass'n.*, 153 F.R.D. 585, 590 (M.D.N.C. 1994); *Wang v. Hsu*, 919 F.2d 130, 131 (10th Cir. 1990).   The only substantive response of any kind that Excelerate offered to NML's Subpoenas came in Mr. Medina's September 5, 2008 letter offering to produce a redacted version of the Charter Party, which states: (1) NML could more properly seek this information from Argentina, and (2) that the structure of the Charter Party was itself protected as a trade secret. (McDermott Decl. Ex. 8).

Because neither of these statements was directed to the First Subpoena, Excelerate has waived any objections it might make to the document requests contained in that subpoena. Moreover, these statements, even if they could be considered objections, are ineffective to

- 14 -

prevent Excelerate's compliance with the Second Subpoena.  As to Excelerate's supposed trade secret objection, because there is "no absolute privilege for trade secrets and similar confidential information," Excelerate must "first establish that the information sought is a trade secret or other confidential information and then demonstrate that its disclosure would cause an identifiable, significant harm." *Stone Connection, Inc. v. Simpson*, 2008 WL 1927033 at *1 (E.D. Tex April 28, 2008);  *Bramell v. Aspen Exploration, Inc*., 2008 WL 4425368 at *2 (E.D. Tex. Sept. 24, 2008).  Here, Excelerate did nothing more than conclude that the Charter Party was protected from production as a trade secret, but because the law clearly requires more before it will protect information from production, the court should disregard this quasi-objection.

Excelerate also claims that this information could be more appropriately sought from Argentina.  Were it that simple.  As described above, Argentina has aggressively resisted all attempts at collection and has bragged about its resistance in the press.  The court presiding over the underlying litigation has repeatedly commented on Argentina's obstinancy and encouraged NML to pursue the very type of discovery it seeks from Excelerate because seeking discovery from Argentina would be fruitless.  In that court's judgment, then, Excelerate's objection, if it can be considered one, is unfounded.  This is especially true considering Excelerate does not contend that it has no responsive documents, or that producing these documents would be burdensome, only that the more appropriate avenue of discovery would be through Argentina. This is simply not the case, and the court should disregard Excelerate's second quasi-objection.

Having made no substantive objections to the Subpoenas, Excelerate has no justification for failing to produce responsive documents and to offer a knowledgeable employee for deposition, thus it should be compelled to do both.

13301844

**IV.      Conclusion**

For the foregoing reasons, NML respectfully requests that this Court order Excelerate to comply fully with the First and Second Subpoenas.

DATED:        November 19, 2008

Respectfully submitted,

    /s/Gretchen S. Sween
Steven R. Daniels
steven.daniels@dechert.com
Gretchen S. Sween
gretchen.sween@dechert.com
Dechert LLP
300 W. 6th Street, Suite 1850
Austin, TX 78701
Telephone: (512) 394-3000

*Counsel for Plaintiff NML Capital, Ltd.*

**OF COUNSEL:**

Robert A. Cohen
robert.cohen@dechert.com
Dennis H. Hranitzky
dennis.hranitzky@dechert.com
Dechert LLP
1095 Avenue of the Americas
New York, NY  10036
Telephone:  (212) 698-3500

Michael McDermott
Dechert LLP
300 W. 6th Street, Sutie 1850
Austin, TX  78701
Telephone:  (512) 394-3000

- 16 -

13301844

## CERTIFICATE OF CONFERENCE

Pursuant to LR 7D, the parties have conferred regarding the relief that NML seeks

through this motion and have been unable to reach full agreement.

_____/s/_____
Gretchen S. Sween

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this was served on all counsel who have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by Federal Express, on November 19, 2008.

_____/s/_____
Gretchen S. Sween

*Counsel for Defendants Excelerate Energy, LLC*

| J. Michael Medina<br>Frederic Dorwart, Lawyers<br>Old City Hall<br>124 E. Fourth St.<br>Tulsa, OK 74103-5027 | |

13301844